IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINH THANONGSINH, | ) |
| Plaintiffs, | ) ) ) ) |
| v. | ) No. 03 C 8842 ) |
| SCHOOL DISTRICT U-46 AND HANAN JAVETZ, individually and in his official capacity, | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant School District U-46's ("District") and Defendant Hanan Javetz's ("Javetz") motion for summary judgment. For the reasons stated below, we grant Defendants' motion for summary judgment in its entirety.

## BACKGROUND

The District is made up of fifty-three schools in the state of Illinois, including Oakhill Elementary School ("Oakhill"). Plaintiff Linh Thanongsinh ("Thanongsinh"), who refers to himself as "an Asian-American male of Chinese and Laotian descent," (A. Compl. Par. 10), began working for the District in October of

1

1991. Thanongsinh contends that he was awarded a Group V Head Custodian position ("Group V position") at Oakhill in 1996, although the District claims that he did not achieve the Group V position status until 2002.

In 2002, the District and Education Support Services Organization ("Union"), the union that represented Thanongsinh, began contract negotiations. During the negotiations the District and the Union agreed to phase out the Group V positions at the District's elementary schools through a certification process and through natural attrition.

The final collective bargaining agreement in 1992 ("CBA"), negotiated by the District and the union, contained the procedure for conducting the certification for Group V positions. Under the procedure, a participant was first given a written test and was required to score at least a fifty. If the participant scored at least a fifty on the written test, the participant could proceed onward and take the "hands-on" portion of the certification process and the participant would receive another score for that test. In order for a participant to be certified, the average of the two test scores of the participant had to be at least seventy. If a participant did not achieve certification on the first try, the participant could begin anew and start the certification process again.

Thanongsinh took the written test for certification on November 8, 2002, and he received a score of 55. Thanongsinh then took the "hands-on" test on March 14, 2003, which was administered by Ron Dugo and Defendant Javetz. Thanongsinh received a score of 66.62 for the "hands-on" test, and since his average score was

60.81, which was below 70, he did not receive certification as required under the CBA. Thanongsinh claims that Javetz purposely gave Thanongsinh a low score because of Thanongsinh's race, so that Thanongsinh would fail the certification process.

On May 3, 2003, Thanongsinh began the certification process again. He scored a 46 on the written test, and, as required by the CBA, he could not proceed to the "hands-on" test because the score was below 50. On June 24, 2003, the District informed Thanongsinh that since he had failed to achieve certification, his job was declassified to a Category 2 Custodian as of July 1, 2003. On September 26, 2003, Thanongsinh began the certification process for the third time and scored a 35.91 on the written test which once again, under the CBA procedures, disqualified him for the "hands-on" test.

In the instant action Thanongsinh has filed an amended complaint which alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I), and violations of 42 U.S.C. § 1981 ("Section 1981") (Count II).

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment the moving party must

identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

# DISCUSSION

## I. Title VII Claims

Defendants move for summary judgment on the Title VII claim. If an employer in a Title VII discrimination case brings a motion for summary judgment, the plaintiff can proceed under the direct or indirect approach in order to defeat the motion. *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). Under the direct approach, the plaintiff can show through direct or circumstantial evidence that the alleged harmful action of the employer was "motivated by an impermissible purpose, such as [his] race or national origin." *Id.*

In regards to a Title VII claim which is based upon a failure to promote, for a *prima facie* case a plaintiff must establish that he was: "(1) a member of a protected class; (2) qualified for the position sought; (3) rejected for the position; and (4) treated less favorably than a similarly situated candidate outside h[is] protected class." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

If a *prima facie* case is established, there is a rebuttable presumption of discrimination and the employer is required to offer a "legitimate, non-discriminatory reason for the adverse employment action." *Cianci v. Pettibone Corp.*, 152 F.3d 723, 726 (7th Cir. 1998). If the employer provides such a reason, the plaintiff must then show that the reason alleged by the employer is merely a pretext for discrimination. *Id.* Thanongsinh does not have sufficient evidence to proceed under the direct approach and will need to proceed under the indirect approach. *See Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005)(stating that "[t]o prove

discrimination via direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus. . . [and that][i]t should not be surprising that in today's politically correct workplace environment such admissions are rarely, if ever, made or encountered . . . ."). In the instant action Defendants concede that Thanongsinh is a member of a protected class.

### A. Rejection for the Position

Defendants concede that Thanongsinh failed to achieve certification on his first attempt during which Javetz allegedly discriminated against him and Defendants admit that Thanongsinh's job status was eventually downgraded due to Thanongsinh's failure to achieve certification. Defendants thus took an adverse employment action against Thanongsinh when they downgraded his status. However, the record is also clear that Defendants gave Thanongsinh every opportunity to achieve certification after the alleged discrimination. Thanongsinh was allowed to take the written test on two more occasions and he failed the written tests.

In fact, Thanongsinh expressly admits pursuant to Local Rule 56.1 that "he did not prepare for the second certification test" despite the fact that the principal of Oakhill "offered to assist Mr. Thanongsinh in preparing for the test. . .[and] offered to help him organize a study group." ( R SF 44, 45). Thanongsinh also admits pursuant to Local Rule 56.1 that "he did not study or prepare for the third

certification test." ( R SF 51). Thus, the responsibility for Thanongsinh's failure on his second and third attempts at the certification process can be placed squarely on the shoulders of Thanongsinh. Thanongsinh, through his own lack of diligence, failed to achieve certification on his second and third attempts which resulted in the declassification of his position. Thus, although Thanongsinh has argued that the first "hands-on" test scoring was unfair, that test at best resulted in only a temporary action by the District. Thanongsinh admits that he was given the second opportunity to achieve certification even before the declassification of his position ( R SF 43, 47), and that he was given an opportunity after the downgrade to achieve certification ( R SF 48), which would have allowed him to regain his Class V position status.

### B. Whether Thanongsinh was Qualified

Defendants contend that Thanongsinh was not qualified for the Group V position. A plaintiff is required to show that he was qualified at the time of the adverse employment action. *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1262 (7th Cir. 1993). Defendants' only argument on this issue is that Thanongsinh was not qualified because he failed in all three of his attempts to attain certification. (Mem. 6). Pursuant to Local Rule 56.1 Thanongsinh admits that he attempted to obtain certification on three separate occasions and that he received a failing score on all three attempts. ( R SF 14, 36, 43, 46, 48, 50). Thanongsinh was given every opportunity to achieve certification. The fact that on two of his three attempts he

could not even proceed past the written portion of the certification process which tests his knowledge of the requirements for a Group V position is a clear indication that he was not qualified for the position.

### C. Similarly Situated Employees

Defendants argue that Thanongsinh has not pointed to similarly situated employees outside the protected class that were treated more favorably than him. An employee is similarly situated if the employee "is one who is 'directly comparable to [the plaintiff] in all material respects.'" *Rogers v. City of Chicago*, 320 F.3d 748, 755 (7th Cir. 2003)(quoting *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002)); *see also Jordan*, 396 F.3d 825, 833 (7th Cir. 2005)(phrasing the fourth element of the prima facie case as requiring a plaintiff to show that "the position was granted to a person outside the protected class who is similarly or less qualified than the plaintiff."); *Snipes v. Ill. Dep't. of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002)(indicating that a similarly situated employee is identified by comparing the employee's "performance, qualifications and conduct" to the plaintiff's "performance, qualifications and conduct.").

### 1. Proper Comparison for Similarly Situated Analysis

In the instant action, all Group V position custodians were required to take the certification test. Defendants argue that Thanongsinh would be similarly situated

8

only with Group V position custodians that failed to obtain certification and that employees that had achieved certification would not be similarly situated. (Mem. 6). However, as explained above, the scoring during the certification process by Javetz is a basic part of the alleged discrimination in this suit. Thanongsinh does not argue in either his complaint or his briefs that the certification tests themselves were formulated in a fashion in order to discriminate against persons of his race. Rather he argues that he failed to attain certification because of Javetz's biased scoring and because Javetz did not provide similar assistance to Thanongsinh that was provided to other test takers, such as giving them a calming instruction. The essence of Thanongsinh's claim is that Javetz was biased in favor of caucasian employees. Thanongsinh attempts to illustrate this point by providing a breakdown of the passing rates for tests administered by Javetz for caucasian applicants and minority applicants. (Ans. 13). Thanongsinh also points to evidence that Dugo thought that Javetz did not give fair scores to Thanongsinh and that Javetz had an animosity towards Thanongsinh. (Ans. 8, 12). Thanongsinh also attempts to show that Javetz held the animosity against Thanongsinh because of his race by showing that Javetz made a comment about Thanongsinh's ability to speak English. (Ans. 13). In fact, in the beginning of Thanongsinh's answer to the instant motion, he states that he "does not complain about Defendants' decision to administer a hands-on certification test." (Ans. 1).

Thus, the proper comparison for the similarly situated analysis in the instant action is between Thanongsinh and other employees that sought Group V

certification that did not share the same racial background as Thanongsinh, and who achieved certification either through fair testing or because the employees were given added assistance which was not provided to Thanongsinh.

## 2. Similarly Situated Comparison

Thanongsinh identifies two individuals and one group of individuals as similarly situated employees.

### a. Mitchell Cain

Thanongsinh first identifies Mitchell Cain ("Cain") who is a caucasian employee who took the "hands-on" test and received a passing score. Thanongsinh contends that Javetz was one of the persons that administered the test for Cain. Thanongsinh claims that he was given a lower score on his first "hands-on" test because he did not have an "M.S.D.S. book," but that Cain was not given a lower score although Cain also did not have an "M.S.D.S. book." However, Thanongsinh's contentions are based upon an unverified score sheet he includes as an exhibit.

In ruling on a summary judgment motion a court can only consider evidence that either would be admissible at trial or evidence that represents other evidence or information that would be admissible at trial. *Scott v. Edinburg*, 346 F.3d 752, 759-60, 760 n.7 (7th Cir. 2003). In regards to the score sheet for Cain's test that is relied upon by Thanongsinh, Thanongsinh has pointed to no testimony or evidence that

10

would lay a proper foundation for the introduction of the score sheet at trial. In the testimony of Dugo that Thanongsinh refers to on this issue, Dugo merely indicated what information he saw on the paper given to him at the deposition.

For instance, Dugo was asked what was meant by a notation of "No M.S.D.S. book" on the unverified score sheet when he was asked "Is it your recollection after looking at this that Mitchell Cain did not have an M.S.D.S. book for his - -. . . ." (Dugo Dep. 59-60). Dugo responded "That's what this looks like here." (Dugo Dep. 60). Dugo did not state that he recollected that Cain did not have a book or that he could tell for sure that Cain did not have a book from the score sheet in front of him. Dugo did not indicate that the score sheet was Cain's or that he knew that it was authentic. Dugo was also specifically asked if he had any recollection as to whether Cain had a book with him and Dugo responded: "No." (Dugo Dep. 60). Thanongsinh has not shown that the score sheet or the information on the score sheet would be inadmissible at trial and any deductions he makes based upon the score sheet is pure speculation and could not be considered by the trier of fact. Thus, Thanongsinh's theory that Cain was given more favorable scoring is based upon pure speculation and Thanongsinh has not shown that Cain was treated more favorably than him.

### b. Mike DiGioia

Thanongsinh also points to Mike DiGioia ("DiGioia") as a similarly situated

employee. DiGioia was assigned in charge of Oakhill when Thanongsinh's position was declassified. However, as Thanongsinh admits pursuant to Local Rule 56.1, DiGioia was a Group 9 Custodian, ( R SF 55), and the certification process that Thanongsinh undertook was for Group V positions. ( R SF 7, 11, 14). There is no contention by Thanongsinh that DiGioia ever took the "hands-on" test and thus no contention that DiGioia was given unequal treatment during a "hands-on" test or that Javetz helped administer such a test. Thus, Thanongsinh cannot show that DiGioia was treated differently than Thanongsinh.

Also, since DiGioia was a Group 9 Custodian he is not similarly situated as to Thanongsinh. Thanongsinh admits that DiGioia only "attends to matters at Oakhill one day a week and attends to other District elementary schools during the remainder of the week." ( R SF 56). DiGioia also testified that his job description was much different than that of a Group V position.

Thanongsinh also argues that DiGioia was less qualified than Thanongsinh. This argument might be applicable if Thanongsinh's allegation of discrimination was based upon DiGioia being chosen for being in charge of Oakhill instead of Thanongsinh. Even if such was Thanongsinh's position, Thanongsinh has failed to point to sufficient evidence for a reasonable trier of fact to conclude that DiGioia was less qualified than Thanongsinh.

Also, DiGioia was simply placed in charge of Oakhill because Thanongsinh's position was declassified and thus, DiGioia's assignment was part of the general plan

for Group 9 custodians to take over for the Group V positions. There is no allegation that the certification process was a scheme by the District to replace Asian Class V position individuals such as Thanongsinh with non-Asian Group 9 position individuals. Thanongsinh does not challenge the appropriateness of the decision to require certification or the phase out of the Group V positions and the placement of Group 9 individuals. Thanongsinh's claim of discrimination is not based upon a complaint that DiGioia was placed in charge of Oakhill instead of Thanongsinh. Thanongsinh recognizes that DiGioia was placed in charge as part of the recognized plan, and Thanongsinh's position is merely that DiGioia would not have been placed in his current position if Thanongsinh had not failed to receive certification.

### c. Caucasian Applicants Tested with McNamara

Finally, Thanongsinh points to caucasian employees that were tested by Cathy McNamara ("McNamara"). Thanongsinh claims that McNamara testified that she always gave a calming instruction to test takers prior to the "hands-on" test and that since Javetz had administered tests with McNamara, he had participated in at least a few tests where such calming instructions were given. Thanongsinh claims that he received no such calming instructions before his first "hand-on" test which was administered by Javetz. However, McNamara merely testified that she told the test takers to "keep safety in mind" and to "make sure" that they followed all the steps "required by the book." (M. dep. 94). There is no indication whatsoever that such a

13

pre-test statement by McNamara would give an unfair advantage to test takers or would have any material impact on the final test scores. It was merely how McNamara chose to speak to the test takers before administering the tests. Secondly, Thanongsinh asserts in his answer that "McNamara administered the hands-on test to fifteen white Head Custodians," (Ans. 7), and Thanongsinh thus implies that McNamara only gave the instructions to caucasian applicants. However, McNamara was asked during her deposition in regards to the pre-test statements: "And you would do that with every custodian testing ?" and McNamara responded: "Yes." (M. dep. 94). Thus, the evidence is clear that had McNamara administered a test for Thanongsinh or for any non-Caucasians, she would have given the same calming instructions. There is no evidence pointed to by Thanongsinh that Javetz routinely gave such a calming instruction to any test takers and there is no evidence that McNamara participated in Thanongsinh's first "hands-on" test. Thus, Thanongsinh, cannot claim that he was similarly situated with the other applicants tested by McNamara or was treated differently in any material manner. Therefore, Thanongsinh has failed to point to sufficient evidence that a similarly situated employee was treated more favorably.

### D. Pretext Analysis

Defendants argue that even if Thanongsinh were to establish a *prima facie* case, Defendants have presented a legitimate non-discriminatory reason for the

declassification of Thanongsinh's status and Defendants contend that Thanongsinh has not pointed to sufficient evidence that the reason is a pretext. Defendants assert that the certification process was a course of action agreed to by the District and the Union. Defendants contend that since Thanongsinh failed to achieve certification it was proper to declassify his status. Thanongsinh argues that the given reason is a pretext for discrimination. To show a pretext a plaintiff must show that "the reason put forth was not a true reason, but a pretext–'a dishonest explanation, a lie rather than an oddity or an error.'" *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004)(quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000)). To assess whether a given reason is a pretext a court must determine "whether the employer gave an honest explanation of its behavior." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004). A court does "not 'sit as a super-personnel department that reexamines an entity's business decisions.'" *Id. See also Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004)(stating that "even if the business decision was ill-considered or unreasonable, provided that the decision maker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist.").

Thanongsinh has given various reasons as to why Defendants' given reason should be deemed pretextual. Thanongsinh claims that since he had already been performing the Group V position duties it is not believable that he would fail the "hands-on" test which dealt with the performance of the job. Thanongsinh also points to testimony by Dugo that indicated that Thanongsinh had performed tasks for

the Group V position prior to his first "hands-on" test. We disagree that such evidence is an indication of a pretext. Simply because Thanongsinh had been performing duties for a Group V position does not mean that he understood them or mean that he could or should pass the particular test designed by the District. Also, just because Thanongsinh may have performed and understood the duties of a Group V position, does not automatically mean that he would not make mistakes on the test. To infer that he failed because of some unfair scoring would be unreasonable and pure speculation.

Thanongsinh also claims that Javetz did not score Thanongsinh in the same manner as he did for caucasian applicants. Thanongsinh points to summaries of the percentages of pass rates according to racial groups. However, such an assertion is pure speculation on the part of Thanongsinh and is largely irrelevant. The relevant question is not what racial group received what scores. Rather the pertinent inquiry is whether all applicants received fair scores based upon their performance on the tests. The percentages of pass rates are not such that they would allow for any reasonable inference that Javetz was biased.

Thanongsinh also argues that there was evidence that Javetz held an animosity towards Thanongsinh. Thanongsinh points to Dugo's testimony in support of this proposition. However, Dugo merely stated that there was "agitation between Hanan and Linh" during the test because Javetz became frustrated with Thanongsinh. (Dugo dep. 26). Dugo stated that during the test "it was a stressful time" and there was

16

"tension in the air between Hanan and Lihn," (Dugo dep. 30-31), but Dugo did not explain such comments or indicate that the "stress" and "tension" was anything other than a natural atmosphere that might develop during a test which is often a stressful experience for a test taker and could be a stressful experience for the administrator of the exam if the administrator becomes frustrated or lacks patience. Dugo does not proceed onward in this testimony to explain if the tension was because Javetz disliked Thanongsinh because of his race. Dugo states nothing during his testimony that would allow one to reasonably infer that the "stress" and "tension" was due to racial animus by Javetz.

Finally, Thanongsinh claims that when he confronted Javetz about the score on the first "hands-on" test, Javetz told him that he "should learn better English." (Ans. 13). Defendants contend that Javetz's comment was intended as a helpful hint, but Thanongsinh claims that it was intended as an insult to Thanongsinh based on his race. It would be unreasonable to deem such a comment in the abstract as an insult. Also, regardless, the comment is not sufficient evidence to meet the pretext requirement even when considered with the other evidence mentioned above that was identified by Thanongsinh. Therefore, even if Thanongsinh could establish a *prima facie* case he has not pointed to sufficient evidence that the given reason was a pretext.

E. Individual and Official Capacity Claims Against Javetz

Defendants move for summary judgment on the Title VII individual capacity and official capacity claims against Javetz. Thanongsinh concedes that Defendants are entitled to summary judgment on the individual capacity claim. (Ans. 14, n.5). In regards to the Title VII official capacity claim, such a claim is synonymous with a claim against the public entity itself since Javetz was employed by the District. *See Gossmeyer v. McDonald* 128 F.3d 481, *494 (7th Cir. 1997)(stating that "[a]n official capacity claim against an individual defendant constitutes a claim against the government entity itself."). Since the District is named as a Defendant, the claim against Javetz in his official capacity is redundant. Therefore, we grant Defendants' motion for summary judgment on the Title VII individual capacity claim and Title VII official capacity claim against Javetz.

II. Section 1981 Claims

Defendants move for summary judgment on the Section 1981 claims against the District and against Javetz in both his official and individual capacities.

A. Claim against District and Official Capacity Claim against Javetz

For a Section 1981 claim against a government body, a plaintiff is required to "show that the violation of h[er] 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of Monell and subsequent cases."

18

*Looper v. Maintenance Serv., Inc. v. City of Indianapolis*, 197 F.3d 908, 913 (7th Cir. 1999); *see also Smith v. Chicago School Reform Bd. of Trustees*, 165 F.3d 1142, 1148-49 (7th Cir. 1999)(stating that "recovery against a governmental body under § 1981 may not be based on *respondeat superior*" and that "[t]he plaintiff must show that the body's official policy or custom was discriminatory."). In regards to the Section 1981 claim against Javetz in his official capacity, such a claim is synonymous with a claim against the public entity itself since Javetz was employed by the District. *Gossmeyer*, 128 F.3d at 494. In the instant action, Thanongsinh has failed to allege or point to evidence of a policy or practice by the District that is a basis for the alleged discrimination against him in violation of Section 1981. *Looper*, 197 F.3d at 913. Therefore, Thanongsinh has failed to establish that either the District or Javetz, in his official capacity, discriminated against Thanongsinh in violation of Section 1981. *Gossmeyer*, 128 F.3d at 494.

### B. Individual Capacity Claim against Javetz

In order to establish a claim under Section 1981, a plaintiff "must show that (1) [he] [is] a member[] of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)." *Morris v. Office Max, Inc.* 89 F.3d 411, 413 (7th Cir. 1996). Thanongsinh has not pointed to any discrimination other than the alleged biased scoring by Javetz

19

on the first "hands-on" test. Accordingly, Thanongsinh has not pointed to sufficient evidence to prove that Javetz intended to discriminate against Thanongsinh because of his race. *Morris*, 89 F.3d at 413. Thanongsinh attempts to support his Section 1981 claim against Javetz by arguing that Javetz was a policy maker at the District because he helped design the certification process. However, even if that were true, it is of no moment in the instant action because, as explained above, Thanongsinh has not challenged the content of the District's certification process. Further, Thanongsinh has failed to point to sufficient evidence that shows that Javetz's alleged conduct towards Thanongsinh "concerned" the "making and enforcing of a contract." *Morris*, 89 F.3d at 413. Therefore, we grant the District's motion for summary judgment on the Section 1981 claim against Javetz in his individual capacity.

## CONCLUSION

Based on the foregoing anglais, we grant Defendants' motion for summary judgment in its entirety.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: June 13, 2005